IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TALLYGENICOM, L.P., *et al.*,[1] | ) Case No. 09-10266(CSS) |
| | ) |
| Debtors. | ) |
| | ) |
| | ) |

**MOTION OF THE DEBTORS FOR ORDERS: ONE (I) APPROVING PROCEDURES
WITH RESPECT TO THE PROPOSED SALE OF THE ASSETS OF THE DEBTORS,
(II) SCHEDULING A HEARING ON THE SALE AND SETTING OBJECTION AND
BIDDING DEADLINES WITH RESPECT TO THE SALE, (III) APPROVING
THE FORM AND MANNER OF NOTICE OF AN AUCTION FOR THE DEBTORS'
ASSETS AND THE SALE HEARING, (IV) APPROVING BID PROTECTIONS,
AND (V) GRANTING RELATED RELIEF; AND THE OTHER (A) AUTHORIZING
THE SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
INTERESTS, PURSUANT TO THE ASSET PURCHASE AGREEMENT RELATED
THERETO, (B) AUTHORIZING AND APPROVING THE ASSET PURCHASE
AGREEMENT, (C) AUTHORIZING AND APPROVING THE TRANSITION SERVICES
AGREEMENT, (D) AUTHORIZING AND APPROVING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, AS NECESSARY IN CONNECTION WITH
THE SALE, AND (E) GRANTING RELATED RELIEF**

TallyGenicom, L.P., TallyGenicom Holdings, LLC and Printing Solutions, Inc., the

debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the

"Company")[2], hereby submit this motion (the "Motion"), pursuant to Sections 105(a), 363, 365,

503 and 507 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy

---

[1] The Debtors are the following entities (followed by their tax identification numbers): TallyGenicom, L.P. (54-1996340), TallyGenicom Holdings, LLC (65-1160834), and Printing Solutions, Inc. (01-0758396). The mailing address for all of the Debtors for the purpose of these Chapter 11 cases is 4500 Daly Drive, Suite 100, Chantilly, VA 20151.

[2] The Debtors' non-debtor, non-U.S. affiliates are: (a) Datacom de Mexico S.A. de C.V., located in Mexico; (b) TallyGenicom AG, Tally Electronik GmbH and TallyGenicom Computerdrucker GmbH, located in Germany; (c) TallyGenicom SAS, located in France; (d) TallyGenicom Ltd., located in the United Kingdom; (e) TallyGenicom Pte Ltd., located in Singapore; (f) TallyGenicom GmbH, located in Austria; (g) TallyGenicom Polska, located in Poland; (h) TallyGenicom S.r.L., located in Italy; (i) Tally Dascom printer Co. Ltd., located in China; (j) TallyGenicom SA PTY Ltd., located in South Africa; and (k) TallyGenicom Sdn Bhd, located in Malaysia (collectively, the "Non-Debtor Affiliates" and, together with the Debtors, "TallyGenicom").

Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), for entry of two orders: one, substantially in the form annexed hereto as

Exhibit A (the "Sale Procedures Order"), (i) approving procedures (the "Sale Procedures") with

respect to the proposed sale (the "Sale") of substantially all of the assets (the "Purchased

Assets") of TallyGenicom, L.P. (the "Seller"), as more specifically described in the Asset

Purchase Agreement (the "APA")[3] with Printronix, Inc. ("Printronix") annexed hereto as Exhibit

D, (ii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection and bidding

deadlines with respect to the Sale, (iii) approving the form and manner of notice of an auction for

the Purchased Assets (the "Auction") and the Sale Hearing, (iv) approving bid protections, (v)

establishing deadlines by which parties may object to the proposed assumption and assignment

of executory contracts and unexpired leases pursuant to the APA (the "Assigned Contracts") and

assert claims for any cure amount, (vi) establishing procedures for the rejection of executory

contracts and unexpired leases not assumed and assigned in connection with the Sale (the

"Unassumed Contracts"), and (vii) granting related relief; and the other, substantially in the form

annexed hereto as Exhibit E (the "Sale Order")[4], (a) authorizing the Sale free and clear of liens,

claims, encumbrances, and interests, pursuant to the APA; (b) authorizing and approving the

APA; (c) authorizing and approving the Transition Services Agreement (the "TSA"); (d)

authorizing and approving the assumption and assignment of certain executory contracts and

unexpired leases, as necessary in connection with the Sale; and (e) granting related relief. In

support of this Motion, the Debtors rely on the Declaration of John Waksmunski in Support of

First Day Relief (the "Waksmunski Declaration") filed contemporaneously herewith and

---

[3] Terms not otherwise defined herein shall have the meanings given to them in the APA.

[4] If the terms of any agreement respecting the Sale require modification of the proposed Sale Order, the Debtors will provide notice of the modified proposed Sale Order to the Court and interested parties in advance of the Sale Hearing.

incorporated herein by reference. In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## STATUS OF CASE AND JURISDICTION

1.  On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including entry of an order to have their cases jointly administered.

2.  The Debtors have continued in possession of their respective properties and have continued to operate their business as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.  No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in the Debtors' cases.

4.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, as complemented by Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND[5]

### A.   The Debtors' Business

5.  The Debtors are leading global providers of industrial-class printing solutions, with a focus on printer manufacturing, distribution, research and development. The Debtors offer a comprehensive selection of (i) serial and line impact printers, monochrome and

---

[5] A more detailed description of the Debtors' business and related business information is set forth in the Waksmunski Declaration and is incorporated herein by reference.

8898/73475-002 Current/12887081v16

color laser printers, and thermal printers, (ii) printing consumables or supplies such as ink ribbons, ink-jet cartridges and toner cartridges, and (iii) printer spare parts. The Debtors also provide support and repair services to their customers in connection with their installed base of over 500,000 printers. The Debtors have a blue chip customer base in a variety of industries, including manufacturing and warehousing, retail, healthcare, public safety, financial services, logistics and transportation, telecommunications and government.

6.     The Debtors' headquarters is located in Chantilly, Virginia. The Debtors' manufacturing facility is located in Reynosa, Mexico and its primary distribution center is located in McAllen, Texas. The Reynosa facility is responsible for the production of several different product lines, including serial and line impact printers, supplies and spare parts. The Reynosa facility also provides contract manufacturing services for other printer distributors, as well as ribbon cartridges and spare parts for use with nearly all of the Debtors' manufactured printers. The McAllen distribution center serves as the Debtors' world-wide distribution hub and also provides significant customization and finishing work to the Debtors' sourced and manufactured products prior to their shipment to customers.

7.     As of the Petition Date, the Debtors employed approximately 150 people. As of the Petition Date, the Debtors had aggregate assets (at book value) and liabilities of approximately $34 million and approximately $62 million, respectively, exclusive of intercompany claims. For the fiscal year ended December 31, 2008, the Debtors had net sales of approximately $75 million and incurred a net loss of approximately $7.5 million, and for the fourth quarter of fiscal 2008, the Debtors had net sales of approximately $18 million and incurred a net loss of approximately $2.5 million, inclusive of intercompany sales.

4

B.    **The Debtors' Debt Structure**

        **Secured Indebtedness**

        8.      ***The Pre-Petition Senior Secured Credit Facility.*** The Debtors' pre-petition operations were primarily financed by a senior secured credit facility (the "Pre-Petition Credit Facility") by and among TallyGenicom, L.P., as borrower, Dymas Funding Company, LLC ("Dymas"), as lender and administrative agent for the other lenders party thereto, and TallyGenicom Holdings, LLC and Printing Solutions, Inc., as guarantors.

        9.      The Pre-Petition Credit Facility is a senior secured credit facility originally consisting of a $31 million secured term loan credit facility (the "Pre-Petition Term Facility") and a $12 million secured revolving credit facility (the "Pre-Petition Revolving Facility"). Credit advances under the Pre-Petition Revolving Facility are made available to the Debtors pursuant to a borrowing base formula calculated upon an agreed multiple of EBITDA less certain outstanding indebtedness. The Pre-Petition Term Facility is a secured, single-draw term loan facility. Any principal amount of the Pre-Petition Term Facility which was repaid could not be reborrowed.

        10.     As of the Petition Date, the aggregate principal amount outstanding under the Pre-Petition Credit Facility was approximately $37.7 million (comprised of $13.9 million under the Pre-Petition Revolving Facility, $23.8 million under the Pre-Petition Term Facility, plus interest, costs, fees, expenses and other charges.

        11.     ***The Subordinated Promissory Notes.*** As of the Petition Date, to enhance liquidity and provide additional working capital, the Debtors also were parties to an $8 million second lien term loan provided pursuant to two separate promissory notes (the "Subordinated Promissory Notes").

5

12. As of the Petition Date, the aggregate principal amount outstanding under the Subordinated Promissory Notes was approximately $8.1 million, plus interest, costs, fees, expenses and other charges.

**Unsecured And Other Indebtedness**

13. As of the Petition Date, the Debtors estimate that the aggregate amount of unsecured claims, exclusive of intercompany claims, was approximately $16 million. The Debtors estimate that they are indebted in the amount of approximately $6.9 million for ordinary course trade payables.

**C.    Events Leading to the Chapter 11 Filing**

14. Over the past three years, the Debtors have experienced a significant decline in sales and revenues as a result of several factors, including primarily (i) a changing printer market characterized by flat to declining demand for the Debtors' line and serial printers, (ii) increasing price competition in emerging markets, (iii) formidable competition in the large and growing laser printer market, and (iv) the overall economic downturn and deterioration of the credit market resulting in decreased capital investment by businesses. In addition, restrictions on borrowings, upward fluctuations in transportation and raw material costs that the Debtors were unable to pass along to customers, as well as occasional credit issues with customers, have also contributed to the Debtors' current severe financial condition.

15. As a result of the foregoing circumstances, the Debtors are facing an acute liquidity crisis, with no access to additional funding and limited restructuring alternatives and anticipate continuing losses.

16. To address these financial difficulties, prior to the Petition Date, the Debtors undertook various actions to improve sales and operating performance, and to reduce expenses. Dating back to 2003, these actions included:  (i) centralizing their production

6

organization; (ii) streamlining operations; and (iii) eliminating redundancy in the Debtors' U.S. operations. In addition, the Debtors have taken and continue to take such measures as: (i) additional employee separations in the Debtors' U.S. operations; (ii) negotiations of lower freight and travel costs; (iii) limitations on capital expenditures and (iv) overall tightening of other controllable expenses.

17.     While the foregoing efforts have helped the Debtors to gain certain efficiencies, their cost savings have not kept pace with their declining revenues. As a result, the Debtors, like many companies in this difficult economic environment, continue to experience significant losses and decreased sales.

## The Debtors' Efforts to Market and Sell the Business

18.     Over the past several years, the Debtors have examined and explored a number of potential alternatives to address the Debtors' debt structure, business operations and financial situation in an effort to restructure their debts outside of bankruptcy, including the location of (a) a strategic or financial partner and (b) the sale to a strategic or financial acquirer of some or all of TallyGenicom's business and assets or equity.

19.     Dating back to 2004, the Debtors had been engaging in discussions with Printronix regarding various potential merger and/or acquisition transactions. In addition to discussions with Printronix, and to facilitate the Debtors' restructuring efforts, in September 2006, the Debtors engaged William Blair & Company ("WBC"), a well-known investment bank, to advise the Debtors on strategic alternatives available to them given the state of their business and to assist the Debtors with implementing a marketing and sale process for TallyGenicom. Through early 2007, WBC assisted the Debtors with developing an offering memorandum and

7

other management presentation materials, and organizing an electronic data room to facilitate due diligence requests.

20.     During the first half of 2007, the Debtors and WBC initially engaged in a limited marketing process, which targeted four (4) potential financial acquirers believed to have a strong interest in some or all of TallyGenicom's business. The Debtors' management and WBC met with each of the potential financial acquirers, but received no concrete expressions of interest in purchasing the business. During the same approximate time period, this process was expanded and an additional eighteen (18) potential strategic acquirers were contacted, which efforts likewise resulted in no expressions of interest in purchasing the business.

21.     The Debtors and WBC thereafter expanded significantly their sale and marketing efforts, canvassing approximately 210 additional potential financial acquirers and an additional five (5) potential strategic acquirers. From this group, the Debtors received four (4) initial expressions of interest. Prior to providing these parties with copies of the offering memorandum and management presentation materials, however, the Debtors and WBC placed the process on hold due to the Company's unanticipated decline in financial performance.

22.     While the Debtors were exploring options with WBC, they continued to simultaneously explore merger and/or acquisition transactions with Printronix. After several months of negotiations, the parties were unable to reach agreement.

23.     After the failure of either the initial WBC marketing efforts or the Printronix discussions to yield a viable transaction, beginning in March 2008 and continuing through June 2008, the Debtors and WBC initiated a second broad sale and marketing process, during which WBC contacted twenty (20) potential strategic acquirers and eight (8) potential financial acquirers believed to have continued interest in some or all of TallyGenicom's

8

business. From this group, the Debtors and WBC conducted teleconference calls with six (6) potential acquirers, which resulted in in-person meetings with four (4) potential acquirers. Following these meetings, the Debtors and WBC provided access to certain financial data and other documents via the data room to three (3) potential acquirers.

24.     As a result, the Debtors received initial expressions of interest from two (2) potential acquirers. The Debtors considered these expressions of interest and, after close examination, determined that they provided insufficient value in comparison to the Company's other strategic options to warrant further negotiations with the potential acquirers at that time. Specifically, as noted above, the Debtors had been engaging in discussions with Printronix regarding potential transactions.

25.     Although negotiations with Printronix had ceased in August 2007, in December 2007, the Debtors had an initial meeting with Vector Capital ("Vector"), which had announced its pending acquisition of Printronix, and Printronix to discuss a possible business combination. The Debtors believed that a transaction with Vector and Printronix had the potential to create greater value for stakeholders than a transaction with either of the two (2) above-mentioned potential acquirers. From May of 2008 through the present date, the Debtors and Vector have continued to engage in discussions regarding the acquisition of the business in several different forms, including: (a) an acquisition of the entire TallyGenicom worldwide business, (b) an equity purchase of the Debtors and (c) an acquisition of certain of the Debtors' business and assets in Chapter 11.

26.     In October and November 2008, as discussions progressed with Vector and Printronix, WBC recanvassed numerous potential acquirers and informed these parties in general terms of TallyGenicom's current structure and valuation. As part of the Debtors' efforts

9

at that time, alternative transactions were explored with the only two (2) potential financial acquirers ("PFA 1" and "PFA 2" and, together, the "PFAs") that had expressed any significant level of interest.

27.     In early November 2008, discussions were had with both PFAs respecting possible transactions involving some or all of TallyGenicom, and the PFAs were provided with updated financials by WBC. Thereafter, PFA 1 withdrew from the process because the valuation was above the level in which it would have an interest. While not formally withdrawing, PFA 2 remained unresponsive after receiving these materials. In late November 2008, after reevaluating valuation issues, WBC again contacted both PFAs. Neither PFA expressed any interest in pursuing a transaction at that time.

28.     Based on the foregoing, the Debtors proceeded with evaluating, negotiating and documenting a possible transaction with Vector and Printronix for the purchase of some or all of the Debtors' business and assets. For the period beginning on December 5, 2008 and ending on December 29, 2008, at the request of Vector and Printronix and by agreement of the parties, the Debtors dealt exclusively with Vector and Printronix regarding a transaction relating to TallyGenicom.

29.     On December 29, 2008, exclusivity with Printronix lapsed and on January 10, 2009, WBC contacted the PFAs with updated income statements and balance sheets for the Debtors through November 2008. Additionally, WBC and the PFAs discussed potential ranges of value and structure consistent with the existing negotiations with Printronix. The Debtors and their investment banker continue to market and explore alternative transactions with respect to TallyGenicom.

8898/73475-002 Current/12887081v16

**D.     The Chapter 11 Filing**

30.     No longer able to sustain business operations in light of the Debtors' current financial situation and with no other viable alternatives, the Debtors' management and board determined that the primary remaining option is to pursue the acquisition transaction with Vector and Printronix through these Chapter 11 cases in a manner intended to maximize the value of the business and assets for stakeholders. Accordingly, the Debtors' boards authorized the filing of these Chapter 11 cases and the proposed sale process.

31.     The Debtors' financial distress, however, is severe and acute. In light of the Debtors' current financial distress and the extensive marketing of the Debtors' business and assets prior to the Petition Date, the Debtors are proposing a shortened period in which additional parties may submit bids for the Debtors' business and assets. Further, the Dymas DIP Agreement requires that the Debtors obtain an order approving a sale to Printronix or another Successful Bidder by no later than 32 days from the Petition Date. If the Debtors do not receive any additional bids during this period, the Debtors will request that the Court authorize the Debtors to consummate the transaction with Vector and Printronix, which the Debtors believe will provide the highest value for stakeholders.

## THE PROPOSED SALE

32.     Pursuant to the APA or such other agreement as the Debtors may enter into with respect to the Sale, the Debtors propose to sell, assign and transfer the Purchased Assets to the Successful Bidder (as defined below), free and clear of all Liens, Claims, and Interests (as defined in the APA) other than those expressly assumed by the Successful Bidder. Any such Liens, Claims and Interests against or in the Purchased Assets will attach to any proceeds of the Sale, in the order of priority and with the same validity, force and effect that such Liens, Claims and Interests may now have against the Purchased Assets. The Sale is subject to

11

the Court's approval and the auction process proposed herein. The Debtors believe that the Sale of the Purchased Assets contemplated by the Sale Procedures on an expedited basis will maximize the value of their estates for the benefit of their creditors and other interested parties.

33.     The significant terms of the APA are:[6]

(a)     Purchased Assets: Substantially all of the assets of the Seller including, without limitation, certain of the following (as specifically set forth in the APA): intellectual property, tools and specialized equipment, inventory and supplies, accounts receivable, the Assigned Contracts,[7] sales and marketing materials, billing information and customer lists, supplier information and supplier lists, books and records, equipment in the Renton Facility, IT systems, litigation rights and causes of action (excluding all avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law), insurance rights, and all permits, authorizations, approvals and licenses issued to the Seller that relate to the Purchased Assets including, without limitation, those listed on a schedule attached to the APA and that may be transferred to Printronix upon entry of an order of the Bankruptcy Court.

(b)     Purchase Price: $36.6275 million, comprised of the following components: (i) Printronix will enter into new credit facilities with its existing lender and Dymas Funding Company, LLC, as administrative agent ("Dymas"), Ableco Finance LLC, A3 Funding LP, A4 Funding LP and A5 Funding LP in an aggregate principal amount owing to Dymas of $23 million, subject to adjustment pursuant to the APA (the "Adjusted Amount") as follows: (x) $8 million to be secured by the assets of Printronix on a first lien basis, after the Closing, and (y) $15 million (which amount shall be reduced to $14.1 million if Printronix does not satisfy its obligations under Section 6.16 by the Closing) to be secured by the assets of Printronix on a second lien basis,

---

[6] The summary of the APA which follows is subject to the full terms of the APA which is annexed hereto as Exhibit D. To the extent that this summary description is inconsistent with the terms of the APA, the terms of the APA shall control. Unless otherwise indicated or defined in this paragraph or elsewhere in this Motion, capitalized terms used in this paragraph have the meanings ascribed to them in the APA.

[7] Printronix shall have a period of not less than the earlier of (i) 180 days after the Closing Date and (ii) 210 days after the Petition Date with regard to real property leases, and 90 days after the Closing Date for all other contracts, to determine which Potentially Assigned Contracts are Assigned Contracts.

12

pursuant to agreements to be entered into at the Closing (the "New Dymas Facilities"), and upon the Closing a portion of the Agent Aggregate Debt (as defined under the Dymas DIP Financing) in the aggregate principal amount equal to the Adjusted Amount would be exchanged for the notes in the principal amount of the Adjusted Amount in order to enable the acquisition of the Business as a going concern, and such exchange of debt would be undertaken by Dymas in order to preserve value in the Prepetition Debt (as defined under the Dymas DIP Financing), not as a new investment or loan decision on the part of the Lenders (as defined under the Dymas DIP Financing) and such portion of the Adjusted Amount received by Dymas (in the form of consideration provided for in the APA) would reduce the Agent Aggregate Debt in accordance with the terms of the Dymas DIP Financing; (ii) Printronix will use its commercially reasonable efforts to provide the warranty and maintenance services to the Seller's customers under the terms and conditions of the Seller's customer warranty and maintenance services agreements, the value of which is estimated at $6.75 million; (iii) Printronix shall reimburse the Seller for wind-down expenses consisting of (x) contract, temporary labor and consulting services, (y) document storage and (z) sale auction and equipment removal fees in an amount not to exceed $87,750; (iv) cash in the amount of $2 million (payable as set forth in Section 3.2 of the APA); and (v) assumption of the Identified A/P, estimated at $4 million. Printronix also shall assume the other Assumed Liabilities described in Article 2 of the APA. The Purchase Price is subject to adjustment on a dollar-for-dollar basis following the Closing in accordance with Section 3.4 of the APA. Further, the Seller may be required to pay Rebates to Printronix in accordance with Section 3.4 of the APA.

(c)     Transition Services Agreement:  As a condition to the closing of the Sale, among other things, the Seller and Printronix shall enter into the TSA, in the form annexed to the APA as Exhibit F.  Pursuant to the TSA, the Seller shall provide and cause Datacom de Mexico S.A. de C.V., its wholly-owned subsidiary, to provide to Printronix certain transitional services that Printronix may need in connection with the APA. Such services are set forth on Schedule A to the TSA and include, without limitation, information technology, manufacturing at the Reynosa Plant, distribution and shipping at the McAllen Distribution Center, purchasing, operations planning, inventory control

custody and quality control, quality, inventory, PPE and tooling audit, service, finance, sales, and marketing. The term of the TSA is six (6) months commencing upon the closing of the Sale (subject to extension as set forth in the TSA). The Seller shall invoice Printronix for its services and reimbursement of expenses, subject to a budget, as set forth in the TSA.

(d) <u>Break-Up Fee/Expense Reimbursement</u>: $2 million Break-Up Fee plus Expense Reimbursement in an aggregate up to $1 million.

(e) <u>"As Is" Condition</u>: As set forth in Section 4.6 of the APA, Printronix agrees that, except as otherwise specifically provided in Section 5 and elsewhere in the APA, the Seller makes no representations or warranties, express or implied, with respect to any matter relating to the Purchased Assets, including, without limitation, any implied warranty of merchantability or fitness for any particular purpose. Accordingly, if the Closing occurs, Printronix will accept the Purchased Assets at the Closing Date "AS IS" and "WHERE IS," subject to the provisions of the APA and the Sale Order providing that the sale of the Purchased Assets is free and clear of all Liens, Claims and Interests.

(f) <u>Waiver and Release of Certain Bankruptcy Claims</u>: As set forth in Section 6.13 of the APA, subject to entry of the Sale Order, the Seller shall not assert, and shall within 10 days of the Closing waive and release, all Bankruptcy Claims against any employee of the Seller or its affiliates performing services under the TSA. Subject to entry of the Sale Order, the Seller shall not assert, and shall within 10 days of the Closing waive and release, all Bankruptcy Claims against any supplier of the Seller relating to the Purchased Assets arising out of or in connection with transactions with or for the benefit of the Seller[8]

(g) <u>Name Change</u>: As set forth in Section 6.14 of the APA, promptly after the Closing, the Seller agrees, among other things, to change its name to some other name not including the words "TallyGenicom", "Tally" or "Genicom".

---

[8] The Debtors submit that this waiver and release is appropriate under the circumstances as a condition to approval of the Sale.

**RELIEF REQUESTED**

34.     By this Motion, the Debtors seek entry of two orders of this Court: (1) one, approving the Sale Procedures with respect to the proposed Sale of the Purchased Assets, scheduling the Sale Hearing and setting objection and bidding deadlines with respect to the Sale, approving the form and manner of notice of an auction for the Purchased Assets and the Sale Hearing, approving bid protections, establishing deadlines by which parties may object to the proposed assumption and assignment of the Assigned Contracts and assert claims for any cure amount, establishing procedures for the rejection of the Unassumed Contracts, and granting related relief; and (2) the other, authorizing the Sale free and clear of Liens, Claims, and Interests, pursuant to the APA, authorizing and approving the APA and the TSA, approving the assumption and assignment of executory contracts and unexpired leases, as necessary in connection with the Sale, and granting related relief.

A.     **Sale Procedures**

35.     The Debtors are proposing the Sale Procedures in an attempt to maximize the realizable value of the Purchased Assets for the benefit of the Debtors' estates, creditors and other interested parties.  The Sale Procedures contemplate an auction process pursuant to which bids for the Purchased Assets will be subject to higher or better offers.  As described below, and more fully in the Sale Procedures, only potential bidders who timely submit Qualifying Bids (each a "Qualifying Bidder" and collectively, the "Qualifying Bidders") will be eligible to participate as bidders in the Auction.  Specifically, the Sale Procedures provide as follows:[9]

    1.     Approvals.  The proposed sale shall in all respects be subject to approval
    by the Bankruptcy Court and the compliance with (i) the applicable provisions of the

---

[9] The Sale Procedures are annexed hereto as Exhibit B.  Capitalized terms used but not defined in this paragraph have the meanings ascribed to them in such Exhibit.

8898/73475-002 Current/12887081v16

Bankruptcy Code; (ii) the Federal Rules of Bankruptcy Procedure; (iii) other applicable rules and law; and (iv) the terms of the APA.

2.     Assets to be Sold.  The Auction shall consist of all of the Purchased Assets free and clear of Liens, Claims, and Interests.

3.     Due Diligence.  Upon execution and delivery of a confidentiality agreement, in form and substance satisfactory to the Seller and its counsel, a potential bidder shall be afforded the opportunity to conduct due diligence on the Purchased Assets through the Bid Deadline.  To obtain a copy of a confidentiality agreement, contact special corporate counsel to the Seller, Proskauer Rose LLP, 1585 Broadway, New York, New York 10036, Attn.: Nigel Austin, Esq., (212) 969-3000, naustin@proskauer.com. Due diligence inquiries and requests should be directed to the above special corporate counsel to the Seller.  Due diligence access may include, at the Seller's discretion, management presentations as may be scheduled by the Seller, access to data rooms, on-site inspections of the Purchased Assets and such other matters as a potential bidder may request and as to which the Seller, in its reasonable discretion, may agree.  The Seller may, in its discretion, coordinate diligence efforts so that multiple potential bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.

4.     Determination of "Qualifying Bidder" Status.  Any potential bidder who wishes to participate in the Auction and bid on the Purchased Assets must demonstrate to the satisfaction of the Seller that such potential bidder is a "Qualifying Bidder".  A Qualifying Bidder is a potential bidder other than the Purchaser who delivers to the Seller a written and binding offer on or before the Bid Deadline that:

(a)     is a bid for the Purchased Assets in their entirety for a price not less than $40,127,500 with a cash portion of at least $3.0 million, and provides for payment in cash in lieu of the face amount of the note payable to Dymas Funding Company, LLC ("Dymas") contemplated by the APA, unless Dymas otherwise agrees to accept a note in its sole and absolute discretion;

(b)     states that the bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Purchased Assets on terms and conditions no less favorable to the Seller than the terms and conditions contained in the APA (as determined by the Seller in its reasonable business judgment), including, without limitation, the purchase of the Purchased Assets and the assumption of the Assumed Liabilities; is accompanied by a clean and duly executed asset purchase agreement (the "Modified APA") and a marked Modified APA reflecting the variations from the APA;

(c)     states that the bidder's offer is irrevocable until the closing of the purchase of the Purchased Assets if such bidder is the Successful Bidder;

(d)     does not request or entitle the bidder to any transaction or break-up fee, expense reimbursement or similar type of payment;

(e)     fully discloses the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(f)     is accompanied by a cash deposit or cashier's check in the amount of $2.5 million (the "Good Faith Deposit"), which the Seller will hold in a segregated account containing only deposits from bidders participating in the Auction, which account will be free and clear of all liens pursuant to an order of the Bankruptcy Court;

(g)     states that the bidder is financially capable of consummating the transactions contemplated by the Modified APA;

(h)     contains such financial and other information that will allow the Seller to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA, including, without limitation, financial and other information sufficient to establish adequate assurance of future performance of any contracts or leases being assigned in connection with the proposed sale of the Purchased Assets;

(i)     does not contain any due diligence or financing contingencies of any kind;

(j)     contains evidence that the bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to finance the purchase of the Purchased Assets, which evidence is satisfactory to the Seller in its sole discretion; and

(k)     includes evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Modified APA.

A competing bid meeting the above requirements shall constitute a "Qualifying Bid". The Seller shall make a determination regarding whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been determined to be qualified by no later than 4:00 p.m. (Prevailing Eastern Time) on [February 23, 2009]. The Purchaser shall be deemed a Qualifying Bidder and the APA constitutes a Qualifying Bid for all purposes.

Notwithstanding the foregoing, to the extent that the Seller receives bids for any of the Purchased Assets and such bids would not otherwise be deemed Qualifying Bids because of the amount of such bids, the Seller shall seek to combine such bids for the purpose of (a) determining whether such bids would, on a combined basis, satisfy the

requirements for a Qualifying Bid, and (b) comparing such bids, on a combined basis, to the highest and best bid for the Purchased Assets, to determine the highest and best bid.

5.     **Bid Deadline.  All Qualifying Bids must be submitted by no later than 12:00 p.m. (Prevailing Eastern Time) on [February 20, 2009] (the "Bid Deadline").** Prior to the Bid Deadline, Qualifying Bidders shall deliver written copies of their bids to: (i) the Seller, 4500 Daly Drive, Suite 100, Chantilly, Virginia 20151, Attn.: Daniel Adragna; (ii) counsel to the Seller, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn.: Robert Dehney, Esq.; (iii) special corporate counsel to the Seller, Proskauer Rose LLP, 1585 Broadway, New York, New York  10036, Attn.: Nigel Austin, Esq. and Scott Rutsky, Esq.; (iv) counsel to the Official Committee of Unsecured Creditors, if and when appointed (the "Committee"); (v) counsel to Dymas, Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603-5792, Attn.: Randall L. Klein, Esq., and Womble Carlyle Sandridge & Rice, PLLC, 222 Delaware Avenue, 15th Floor, Wilmington, Delaware 19801, Attn.: Steven K. Kortanek, Esq.; and (vi) counsel to the Purchaser, O'Melveny & Myers LLP, 2 Embarcadero Center, 28th Floor, San Francisco, California 94111, Attn.: Suzzanne Uhland, Esq., and Richards, Layton & Finger, P.A., One Rodney Square, P.O. Box 551, Wilmington, Delaware, 19899, Attn.: Mark D. Collins, Esq.

6.     Due Diligence From Potential Bidders.  Each potential bidder shall comply with all reasonable requests for additional information by the Seller or its advisors regarding such potential bidder's financial wherewithal to consummate and perform obligations in connection with the Sale.  Failure by the potential bidder to comply with requests for additional information may be a basis for the Seller to determine that a bid made by the potential bidder is not a Qualifying Bid.

7.     No Qualifying Bids.  If no timely conforming Qualifying Bids are submitted by the Bid Deadline other than the APA, the Seller shall not hold an Auction and instead shall request at the Sale Hearing (as defined below) that the Bankruptcy Court approve the APA.

8.     Auction.  In the event that the Seller receives by the Bid Deadline one or more bids that it deems in its discretion to constitute Qualifying Bids other than the APA, the Seller shall conduct an auction with respect to the Purchased Assets (the "Auction"). **The Auction shall take place on [February 25, 2009 at 10:00 a.m.] (prevailing Eastern Time)** at the offices of Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, Wilmington, Delaware 19899-1347, or such other place and time as the Seller shall notify all Qualifying Bidders, the Committee, Dymas, and other invitees via e-mail or facsimile.  If, however, no such other Qualifying Bid is received by the Bid Deadline, then the Auction will not be held.  The Auction shall be conducted by telephonic conference call, internet, or such other method as designated by the Seller.  The Auction shall be governed by the following procedures:

(a)     Only representatives of the Seller, Dymas, the Purchaser, and Qualifying Bidders may participate at the Auction;

18

(b)     Only the Purchaser and other Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(c)     Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

(d)     Bidding shall commence at the amount of the highest and/or best Qualifying Bid submitted by the Qualifying Bidders prior to the Auction;

(e)     The Purchaser and the Qualifying Bidders shall participate in person at the Auction, or through a duly authorized representative;

(f)     All Qualifying Bidders shall have the right to submit additional bids and make additional modifications to the APA or Modified APA, as applicable, at or before the Auction;

(g)     The Auction will be conducted so that each Qualifying Bidder will be informed of the terms of the previous bid;

(h)     Qualifying Bidders may then submit successive bids in increments of at least $100,000 higher than the bid at which the Auction commenced and then continue in minimum increments of at least $100,000 higher than the previous bid;

(i)     Bidding shall be conducted in one pass rounds;

(j)     The Auction shall continue until there is only one offer that the Seller determines, subject to Bankruptcy Court approval, is the highest and best offer submitted at the Auction from among the Qualifying Bidders and the Purchaser (the "Successful Bid"). The bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of the Purchaser, as set forth in the applicable Modified APA. For purposes of determining the Successful Bid, any overbid submitted by the Purchaser shall be deemed to include the full amount of the Break-Up Fee (as defined below) and the Expense Reimbursement (as defined below). Within three days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Bids made after the close of Auction shall not be considered by the Bankruptcy Court.

The Seller reserves the right, as it may determine to be in the best interests of its estate, and in consultation with Dymas and the Committee, to: (i) determine which bidders are Qualifying Bidders, except that the Purchaser is deemed a Qualifying Bidder for all purposes; (ii) determine which bids are Qualifying Bids, except that the APA is deemed a Qualifying Bid for all purposes; (iii) determine which Qualifying Bid is the highest and/or best proposal and which is the next highest and/or best proposal; (iv) reject

8898/73475-002 Current/12887081v16

any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Sale Procedures Order or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Seller and its estate; (v) extend the deadlines set forth herein; (vi) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (vii) modify the Sale Procedures as it may determine to be in the best interests of its estate or to withdraw the Motion at any time with or without prejudice (provided that the Seller shall not waive or modify the Sale Procedures in a manner that would waive or modify the bid protections afforded to the Purchaser). Without limiting the generality of the foregoing, the Seller may determine to distribute or not distribute copies of other Qualifying Bids to other Qualifying Bidders prior to or during the Auction.

9. <u>Sale Hearing</u>. The Successful Bid (or the APA, if no Qualifying Bid other than that of the Purchaser is received and accepted) will be subject to approval by the Bankruptcy Court. Please be advised that the hearing to approve the sale of the Purchased Assets to the Successful Bidder (the "<u>Sale Hearing</u>") will take place on [February 27, 2009 at 10:00 a.m.] (Prevailing Eastern Time), or at such time thereafter as counsel may be heard, in the United States Bankruptcy Court, District of Delaware. The Sale Hearing may be adjourned with the consent of the Successful Bidder from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

10. <u>Acceptance of the Successful Bid</u>. The Seller shall have accepted a Qualifying Bid only when (i) the Bankruptcy Court has approved the Successful Bid and an order approving such bid has been docketed, (ii) definitive documentation has been executed in respect thereof; and (iii) the Sale closes. In the event that, for any reason, the Successful Bidder fails to close the Sale transaction contemplated by its Successful Bid, then, without notice to any other party or further court order, the Seller shall be authorized to close with the Qualifying Bidder that submitted the next highest or otherwise best offer after the Successful Bid (the "<u>Next Highest Bid</u>," and the Qualifying Bidder that submitted such bid, the "<u>Next Highest Bidder</u>") at the discretion of the Next Highest Bidder.

11. <u>Payment of Break-Up Fee and Expense Reimbursement</u>. So long as Purchaser is not in material breach of its obligations under the APA (and has been provided reasonable notice and opportunity to cure by Seller in the event of any material breach by Purchaser), if Seller sells, transfers, leases or otherwise disposes of, directly or indirectly (including through an asset sale, stock sale, merger or other similar transaction) all or substantially all of the Business or the Purchased Assets in a transaction or a series of transactions with one or more Persons other than Purchaser in any circumstance, including in accordance with the Sale Procedures (such event being an "<u>Alternative Transaction</u>"), Seller shall pay to Purchaser out of the proceeds of such Alternative Transaction: within two business days after the consummation of such Alternative Transaction: (i) reimbursement of Purchaser's reasonable, actual out-of-pocket fees and expenses, including reasonable attorneys' fees and expenses of other consultants, incurred in connection with the transaction contemplated by the APA (the "<u>Expense Reimbursement</u>") in aggregate up to $1 million in cash, and (ii) a break-up fee of $2 million (the "<u>Break-Up Fee</u>"). The Break-Up Fee and the Expense Reimbursement shall

20

be paid as administrative expenses of the Seller with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code and the Purchaser shall be entitled to a first priority priming lien senior to the lien securing the Dymas DIP Financing on the proceeds of the Alternative Transaction until such Break-Up Fee and Expense Reimbursement are paid in full. The Break-Up Fee and the Expense Reimbursement shall survive termination of the APA, and entry of the Sale Procedures Order by the Bankruptcy Court shall bind the Seller's senior secured lenders to the treatment of the Break-Up Fee and the Expense Reimbursement.

        12.    <u>Return of Good Faith Deposit</u>. Good Faith Deposits submitted by Qualifying Bidders (other than the Successful Bidder) that have not been forfeited shall be returned upon or within one (1) business day after closing of the Sale. The Deposit of the Successful Bidder shall be held until the closing of the Sale and applied in accordance with the Successful Bid. If for any reason the Qualifying Bidder with the Successful Bid and/or the Next Highest Bid does not close on the Sale, its Deposit shall be forfeited.

**B.**    **<u>Notice of Auction and Sale Hearing</u>**

        36.    The Debtors seek to have the Sale Procedures Hearing on February 10, 2009, with an objection deadline of February 9, 2009. Additionally, the Debtors seek to have the Sale Hearing on February 27, 2009, with an objection deadline prior to such hearing.

        37.    The Debtors shall cause the Sale Procedures Order to be served by first class mail on all of the parties served with notice of the Motion on or before two business days after the entry of the Sale Procedures Order, and request that the Court approve such service as reasonable under the circumstances.

        38.    The Debtors shall cause the Notice of Auction and Sale Hearing, substantially in the form annexed hereto as <u>Exhibit C</u>, to be served by first-class mail on or before two business days after entry of the Sale Procedures Order, and requests that the Court approve such service as reasonable under the circumstances, on the following:

        (i)     the Office of the United States Trustee;

        (ii)    counsel for Dymas;

        (iii)   counsel for Printronix;

(iv)     counsel for any statutory committee(s) appointed in these Chapter 11 cases;

(v)     all entities known to have expressed a bona fide interest in acquiring the Purchased Assets;

(vi)     all entities (or counsel therefor) known to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon the Purchased Assets;

(vii)     all creditors of the Debtors including, without limitation, all known vendors, suppliers, customers, lenders, and contract, license and lease counterparties;

(viii)     all federal, state, and local taxing authorities, recording offices or any other governmental authorities (a) with jurisdiction over the Debtors' business, (b) that, as a result of the Sale, may have claims, contingent or otherwise, against the Debtors' estates, (c) that are parties to governmental approvals or permits, or (d) having any reasonably known interest in the relief requested by the Motion;

(ix)     all state attorneys general in states in which the Debtors do business;

(x)     the United States Attorney's office;

(xi)     the Securities and Exchange Commission;

(xii)     all foreign receiverships of affiliates of the Debtors;

(xiii)     the Internal Revenue Service; and

(xiv)     all parties who have filed a Notice of Appearance or Request for Service of Papers in the Debtors' Chapter 11 cases as of the date of the entry of the Sale Procedures Order.

In addition to the Notice of Auction and Sale Hearing, the Debtors also shall cause the Sale Procedures Order and the Sale Procedures to be served on all entities known to have expressed a bona fide interest in acquiring the Purchased Assets.

39.     The Debtors shall publish the Notice of Auction and Sale Hearing once in the national edition of the Wall Street Journal (or a similar industry publication of comparable

circulation) as soon as practicable after entry of the Sale Procedures Order but on or before seven (7) days prior to the Bid Deadline (as such deadline may be extended).

40.     Further, to facilitate the Sale and the assumption and assignment of the Assigned Contracts set forth in the APA, the Debtors shall cause the Notice of the Potential Assumption and Assignment of Executory Contracts and Unexpired Leases, in substantially the form annexed hereto as Exhibit F (the "Assignment Notice"), to be served by first class mail on all non-debtor parties to the Assigned Contracts which may potentially be assumed and assigned (the "Potentially Assigned Contracts"), on or before two business days after the entry of the Sale Procedures Order.

41.     The Debtors shall attach to the Assignment Notice their calculation of the undisputed cure amounts that the Debtors believe must be paid to cure all defaults under the Potentially Assigned Contracts (the "Proposed Cure Amounts"). As set forth in the APA, the Debtors are prepared to pay the Proposed Cure Amounts up to $300,000 in the aggregate and shall place all such funds in escrow pending termination of the Contract Determination Date, and the Successful Bidder shall be responsible for the cure amounts in excess of $300,000. If no amount is listed on the Assignment Notice to be served, the Debtors believe that there is no Cure Amount.

42.     The Debtors request that unless the non-debtor party to a Potentially Assigned Contract (i) files with the Bankruptcy Court an objection (the "Contract Objection") to the assumption and assignment of the Potentially Assigned Contract, the adequate assurance of future performance of such Potentially Assigned Contract, and the scheduled Proposed Cure Amount by 4:00 p.m. (prevailing Eastern Time) one business day prior to the Auction (the "Contract Objection Deadline") and (ii) serves a copy of the Contract Objection so as to be

received no later than the Contract Objection Deadline on: (a) the Debtors, 4500 Daly Drive, Suite 100, Chantilly, Virginia 20151, Attn.: Daniel Adragna, (b) counsel to the Debtors, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn.: Robert Dehney, Esq., (c) special corporate counsel to the Debtors, Proskauer Rose LLP, 1585 Broadway, New York, New York 10036, Attn.: Nigel Austin, Esq. and Scott Rutsky, Esq., (d) counsel to Dymas, Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603-5792, Attn.: Randall L. Klein, Esq., and Womble Carlyle Sandridge & Rice, PLLC, 222 Delaware Avenue, 15th Floor, Wilmington, Delaware 19801, Attn.: Steven K. Kortanek, Esq., (e) counsel to the Official Committee of Unsecured Creditors, if and when appointed (the "Committee"), (f) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801, and (g) counsel to Printronix, O'Melveny & Myers LLP, 2 Embarcadero Center, 28th Floor, San Francisco, California 94111, Attn.: Suzzanne Uhland, Esq., and Richards, Layton & Finger, P.A., One Rodney Square, P.O. Box 551, Wilmington, Delaware, 19899, Attn.: Mark D. Collins, Esq., such non-debtor party should (i) be forever barred from objecting to the assumption and assignment of the Potentially Assigned Contract or the Proposed Cure Amount and from asserting any additional cure or other amounts with respect to such Potentially Assigned Contract and the Debtors shall be entitled to rely solely upon the Proposed Cure Amount; and (ii) be deemed to have consented to the assumption and assignment of such Potentially Assigned Contract and shall be forever barred and estopped from asserting or claiming against the Debtors, Printronix or such other successful bidder or any other assignee of the Potentially Assigned Contract that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Potentially Assigned Contract and/or that adequate assurance of future

24

performance has not been provided should such Potentially Assigned Contract become an Assigned Contract.

43.     In the event that a Contract Objection is filed, the Contract Objection must set forth with specificity (i) the basis for the objection and (ii) the amount the party asserts as the cure amount. After receipt of the Contract Objection, the Debtors will attempt to provide additional adequate assurance of future performance or reconcile any differences in the Proposed Cure Amount as applicable. In the event that the Debtors and the non-debtor party cannot consensually resolve the Contract Objection, and the Court does not otherwise make a determination at the Sale Hearing, the Debtors and/or Printronix will segregate any disputed cure amounts for Potentially Assigned Contracts pending the resolution of any such disputes by this Court or mutual agreement of the parties.

## C.     **Bid Protections**

44.     To induce Printronix to expend the time, energy and resources necessary to submit a "stalking horse" bid, the Debtors request approval of certain buyer protections included in the APA. Specifically, the APA provides for the payment of the Break-Up Fee and the Expense Reimbursement to Printronix if the Debtors enter into an Alternative Transaction (as that term is defined in the APA). The Debtors are obligated to pay the Break-Up Fee and the Expense Reimbursement within two business days after the consummation of an Alternative Transaction from the proceeds of such Alternative Transaction as administrative expenses of the Seller with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code. Printronix is entitled to a first priority priming lien senior to the lien securing the Dymas DIP Financing on the proceeds of the Alternative Transaction until such Break-Up Fee and Expense Reimbursement are paid in full. The Break-Up Fee and the Expense Reimbursement shall survive termination of the APA and the entry of

the Sale Procedures Order shall bind the Seller's senior secured lenders to the treatment of the Break-Up Fee and the Expense Reimbursement.

## AUTHORITY FOR REQUESTED RELIEF

**A.    The Sale is Within the Sound Business
Judgment of the Debtors and Should be Approved**

45.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors.  See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

46.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith. Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign

8898/73475-002 Current/12887081v16

Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization). In this case, the Debtors submit that the decision to proceed with the Sale of the Purchased Assets and the Sale Procedures related thereto are based upon their sound business judgment and should be approved.

47.     Additionally, Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its Section 105(a) power is proper. In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to Section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it

27

has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

48.     The Debtors submit that more than ample business justification exists to sell the Purchased Assets to the Successful Bidder (or the Next Highest Bidder) pursuant to the Sale Procedures.  First, the Debtors believe that a targeted sale process is most likely to achieve the highest and best price for the Purchased Assets.  Furthermore, the Debtors believe that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of their estates for the benefit of their stakeholders.  Finally, the Debtors believe that given their current financial status, unless they are permitted to sell the Purchased Assets pursuant to the Sale Procedures set forth herein, they immediately would be faced with converting their cases to cases under Chapter 7.  Moreover, the Dymas DIP Financing requires that the Debtors obtain an order approving the Sale no later than 32 days after the Petition Date.  Therefore, time is of the essence to approve the Sale, which Dymas supports.

49.     The notice described herein and in the Sale Procedures provides adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Purchased Assets.  Accordingly, the proposed Sale satisfies the second prong of the Abbotts Dairies standard.

50.     In addition to the Debtors' marketing efforts (discussed in detail in the Background section of this Motion at paragraphs 18 through 29 and in the Waksmunski Declaration), the Sale Procedures are designed to maximize the value received for the Purchased Assets.  The process proposed by the Debtors allows for a timely auction process while providing bidders ample time and information to submit a timely bid.  Along with the Debtors'

28

ample marketing process, the Sale Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price. The Debtors have subjected and are subjecting the value of the Purchased Assets to market testing and permitting prospective purchasers to bid on the Purchased Assets. To the extent Printronix is the Successful Bidder or the Successful Bidder otherwise requires transition services, the provision of such services by the Debtors should be authorized. Only by providing such services are the Debtors able to obtain a going concern value for their business and the cost of such services is born by Printronix. The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised auction process, as set forth in the Sale Procedures. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Purchased Assets will be fair and reasonable, and therefore the third prong of the Abbotts Dairies standard is satisfied.

**B.     The Sale is Proposed in "Good Faith"
Under Section 363(m) of the Bankruptcy Code**

51.     As discussed below, the "good faith" prong of the Abbotts Dairies standard is also satisfied here. The Debtors request that the Court find that the Successful Bidder (or Next Highest Bidder) is entitled to the benefits and protections provided by Section 363(m) of the Bankruptcy Code in connection with the Sale.

52.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

8898/73475-002 Current/12887081v16

53.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to Section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, Section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Purchased Assets. Additionally, the United States Court of Appeals for the Third Circuit has indicated that Section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Section 365 of the Bankruptcy Code. Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d Cir. 1998). In Krebs, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." Id. at 497. Despite the absence of an explicit reference to assignments of executory contracts under Section 365 of the Bankruptcy Code, the Court in Krebs concluded that Section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in Krebs, the Assigned Contracts are executory contracts that may be assumed and assigned pursuant to Section 365 of the Bankruptcy Code. In light of Krebs, the Debtors respectfully submit that Section 363(m) applies to protect the Successful Bidder (or the Next Highest Bidder) with respect to both the Assigned Contracts and the Purchased Assets.

54.    As required by Section 363(m) of the Bankruptcy Code, the Sale Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the Sale and the assignment of the Assigned Contracts. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing Section 363(m) of the Bankruptcy Code, has stated that "the phrase

encompasses one who purchases in 'good faith' and for 'value'." Abbotts Dairies, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

55.     Here, the sale of the Purchased Assets and the assignment of the Assigned Contracts is in good faith. There is no evidence of fraud or collusion in the terms of the Sale and the assignment of the Assigned Contracts. To the contrary, as discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, the APA will be the culmination of a solicitation and negotiation process in which all parties will be represented by sophisticated counsel and financial advisors. No known potential bidder is an insider of the Debtors, as that term is defined in Section 101(31) of the Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arms' length, good faith basis. With respect to the potential bidders, the Sale Procedures are designed to ensure that no party is able to exert undue influence over the process. Under the circumstances, the Successful Bidder (or the Next Highest Bidder) should be afforded the protections that Section 363(m) of the Bankruptcy Code provides to a good faith purchaser. Furthermore, the Sale Procedures are designed to prevent the Debtors or the Successful Bidder (or the Next Highest Bidder) from engaging in any conduct that would

31

cause or permit the APA, or the sale of the Purchased Assets to the Successful Bidder (or the Next Highest Bidder) pursuant thereto and hereto, to be avoided under Section 363(n) of the Bankruptcy Code.

56.     All parties in interest will receive notice of the Sale and will be provided with an opportunity to be heard.  Additionally, all counterparties to the Assigned Contracts will be provided notice of assumption and assignment and an opportunity to be heard.  The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under Sections 363(b) and 365 of the Bankruptcy Code.

**C.     The Sale Satisfies the Requirements
        of Section 363(f) of the Bankruptcy Code**

57.     The Debtors request that the Court approve the Sale of the Purchased Assets free and clear of all Liens, Claims and Interests (as defined in the APA) pursuant to Section 363(f) of the Bankruptcy Code.  Under Section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).  Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by Section

32

363(f). See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

58.     A sale of the Purchased Assets other than one free and clear of Liens, Claims and Interests would be of substantially less benefit to and would adversely affect the Debtors' bankruptcy estates. Without limiting the generality of the foregoing, other than the Assumed Liabilities, Printronix would not have entered into the APA and would not consummate the transactions contemplated thereby if the Sale and the assignment of the Assigned Contracts were not free and clear of all Liens, Claims and Interests of any kind or nature whatsoever, other than the Assumed Liabilities, or if Printronix would or in the future could be liable for any Liens, Claims and Interests, other than the Assumed Liabilities, including but not limited to any liability arising out of or related to any (i) employee or consultant of Seller, any Seller affiliate or the Bankruptcy Estate, including any liability with respect to or arising out of any Seller Plan, any liability with respect to the Worker Adjustment and Retraining Notification (WARN) Act and any liability with respect to COBRA coverage for employees or consultants of Seller or the Bankruptcy Estate terminated prior to or as part of the consummation of the transactions set forth in the APA; (ii) Seller Plan, whether or not such liability or obligation arises prior to, on, or following the Closing; (iii) any costs or expenses incurred in connection with or related to the administration of the Bankruptcy Case, including without limitation any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Case; (iv) liabilities under any warranty, guaranty or similar obligation of Seller or the Bankruptcy Estate arising from or relating to any acts or transactions prior to the Closing Date; (v) any liabilities or obligations with respect to any litigation or threatened

8898/73475-002 Current/12887081v16

litigation, claim, obligation, damages, costs and expenses relating to or arising out of any acts or omissions of Seller or the Bankruptcy Estate or any use of any of the Purchased Assets prior to the Closing Date, whether arising under contract, tort, civil or criminal law or otherwise; (vi) liabilities for environmental claims, whether arising under contract or statute, including without limitation any and all laws relating to pollution or the environment, including the Comprehensive Environmental Recovery, Compensation, and Liability Act, as amended, 42 U.S.C. § 9601, et seq. ("CERCLA"), the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901, et seq. ("RCRA"), the Clean Air Act, 42 U.S.C. § 7401, the Occupational Safety and Health Act, 29 U.S.C. § 600, et seq. ("OSHA"), and all other laws and regulations relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, pesticides or industrial, infectious, toxic or hazardous substances or wastes into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or otherwise relating to the processing, generation, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals or industrial, infectious, toxic or hazardous substances or wastes (collectively, "Environmental Laws"); (vii) all obligations of Seller, its affiliates or the Bankruptcy Estate relating to taxes (other than with respect to the Purchased Assets for periods beginning after the Closing Date); (viii) all liabilities in respect of all indebtedness of Seller or the Bankruptcy Estate; (ix) any accounts payable of Seller or the Bankruptcy Estate other than the Identified A/P; (x) liabilities and obligations arising under any and all contracts of Seller other than the Assigned Contracts; (xi) liabilities and obligations under the Assigned Contracts accruing, arising out of or to be performed prior to the effective date of the assignment to Printronix of the Assigned Contracts; (xii) any liabilities or obligations under maintenance and other deferred service contracts,

including in all cases any obligation to pay money to the counter-party pursuant to or upon cancellation of any such contract; (xiii) any and all taxes accrued or assessed on the Purchased Assets prior to the Closing Date; (xiv) any Reclamation Claim or liability related thereto other than to the extent included in the Identified A/P; (xv) any liabilities of Seller to any of its affiliates or any liability affiliate of Seller; or (xvi) any liabilities arising under any and all Excluded Assets.

59.     The Debtors believe that Section 363(f) of the Bankruptcy Code is satisfied with respect to any and all Liens, Claims and Interests (as defined in the APA). Specifically, the Debtors' lenders and any other creditors having liens on the Purchased Assets have thoroughly reviewed the Debtors' alternatives and have consented to the Sale. The Sale is further permitted by applicable non-bankruptcy law and all other parties that could assert a lien, claim or interest could be compelled to accept a money satisfaction for such interest.

**D.      Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Approved**

60.     As noted, to facilitate and effect the sale of the Purchased Assets, the Debtors seek authority to assume and assign the Assigned Contracts related to the Purchased Assets to the Successful Bidder (or the Next Highest Bidder) to the extent required by such Successful Bidder (or the Next Highest Bidder). Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Bankruptcy Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. See 11 U.S.C. § 365(b). A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. Group of Institutional Investors v. Chicago,

8898/73475-002 Current/12887081v16

Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act section 77

subsection (b), the predecessor to Bankruptcy Code Section 365 and rejecting the test of whether

the executory contract was burdensome in favor of whether rejection is within the debtor's

business judgment); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043,

1046-47 (4th Cir. 1985).

      61.    The meaning of "adequate assurance of future performance" depends on

the facts and circumstances of each case, but should be given "practical, pragmatic construction."

See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr.

D.N.J. 1989).  Among other things, adequate assurance may be given by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate

assurance of future performance present when the prospective assignee of a lease from the

debtors has the financial resources and has expressed a willingness to devote sufficient funding

to the business in order to give it a strong likelihood of succeeding; "chief determinant of

adequate assurance of future performance is whether rent will be paid").

      62.    The Successful Bidder (or the Next Highest Bidder) may desire to take

assignment of certain executory contracts and unexpired leases related to the Purchased Assets.

Pursuant to the APA, Printronix has the ability to direct the Seller to assume and assign (a) a

Potentially Assigned Contract that is a real property lease within the earlier of (i) 180 days from

the Closing Date and (ii) 210 days from the Petition Date and (b) any other Potentially Assigned

Contract within 90 days from the Closing Date (the "Contract Determination Date").  The APA

further provides that no Potentially Assigned Contract shall be assumed and assigned without the

express written direction of Printronix by the Contract Determination Date.  To the extent

Assigned Contracts are identified, the Debtors believe that they can and will demonstrate that all requirements for assumption and assignment of the Assigned Contracts (including, without limitation, that all defaults are or will be cured and that adequate assurance of future performance has been provided) will be satisfied at the Sale Hearing or such other date as may be agreed by the parties or fixed by the Court. The Debtors, as required by the Sale Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Purchased Assets. Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Purchased Assets and assuming and assigning the Assigned Contracts to the Successful Bidder (or the Next Highest Bidder) would be in the best interests of their estates.

63.     Moreover, as noted, the Debtors will provide all parties to the Potentially Assigned Contracts an opportunity to be heard. Specifically, a notice identifying any Potentially Assigned Contracts will be provided to each non-debtor party to a Potentially Assigned Contract. Such notice will, among other things, list the Debtors' proposed cure amounts. Each non-debtor party to a Potentially Assigned Contract will receive notice as soon as reasonably practicable to object to such assignment, cure amount and/or whether adequate assurance of future performance has been provided. If no such objection is received, the assignment of the applicable Potentially Assigned Contract, and the Debtors' proposed cure amount, would be approved if and when Printronix designates such Potentially Assigned Contract as an Assigned Contract.

64.     For the foregoing reasons, the Debtors respectfully submit that assumption and assignment of the Assigned Contracts should be approved.

**E.    Rejection Procedures for Executory Contracts and Unexpired Leases
       Not Assumed and Assigned in Connection with the Sale Should Be Approved**

65.    Since certain executory contracts and unexpired leases will not be assumed and assigned to the Successful Bidder (or the Next Highest Bidder), the Debtors may determine to reject such Unassumed Contracts during their Chapter 11 cases. The Debtors' assets, including their executory contracts and leases, have been marketed extensively. In light of the limited funding available to administer the Debtors' Chapter 11 cases, if the Successful Bidder (or the Next Highest Bidder) does not wish to take an assignment of certain contracts and leases, the Debtors will need to proceed with the rejection of such contracts and leases expeditiously. Accordingly, the Debtors seek to establish procedures to reject the Unassumed Contracts that cannot be profitably assumed and assigned to a third party. In the sound exercise of their business judgment, the Debtors have determined that the rejection of the Unassumed Contracts from time to time in accordance with certain streamlined procedures set forth below will allow the Debtors to immediately terminate ongoing payment obligations under such Unassumed Contracts and therefore is in the best interests of the Debtors' creditors and estates.

66.    Rather than filing a separate motion seeking approval of each rejection of an Unassumed Contract, and incurring the expenses and delay attendant thereto, the Debtors believe that the following procedures (the "Rejection Procedures") are in the best interests of all parties-in-interest and should be approved:

       (a)    Any Unassumed Contract deemed unnecessary or burdensome to the Debtors' estates based upon the sound business judgment of the Debtors may be rejected upon the Debtors giving written notice, via facsimile or overnight mail, to (i) the counterparty to the respective Unassumed Contract and (ii) any official committee of unsecured creditors appointed in these cases. The notice will be substantially in the form of the Notice of Rejection annexed hereto as Exhibit G (the "Rejection Notice"), which the Debtors request be approved.

8898/73475-002 Current/12887081v16

(b)     Executory contracts shall be deemed rejected effective on the date that is five (5) days from the date the Rejection Notice is served and real property leases shall be deemed rejected effective the later of (i) the date that is five (5) days from the date the Rejection Notice is served or (ii) the date that the Debtors unequivocally relinquish control of the premises by turning over keys or "key codes" to the affected landlord, without further notice, hearing or order of the Court (in each case, the "Effective Date of Rejection").

(c)     If an objection to a Rejection Notice is properly filed and served on counsel to the Debtors and the other Rejection Notice Parties set forth in the Rejection Notice, the Court will schedule a hearing to consider that objection. If that objection is overruled by the Court or withdrawn, the rejection of the Unassumed Contract shall be deemed effective on the Effective Date of Rejection. If no objection is properly served and filed, the rejection of the applicable Unassumed Contract shall become effective on the Effective Date of Rejection, without further notice, hearing or order of the Court.

67.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). As noted by the United States Court of Appeals for the Second Circuit, "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to renounce title to and abandon burdensome property." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 Collier on Bankruptcy 365.01[1] (15th ed. 1993)). The standard governing motions to reject an executory contract or lease pursuant to Section 365 of the Bankruptcy Code is the business judgment test, which requires a showing that the proposed course of action will benefit the estate. See Sharon Steel Corp. v. National Fuel Gas Distribution Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984). The business judgment test "'requires only that the trustee [or debtor-in-possession]

39

demonstrate that rejection of the contract will benefit the estate.'" <u>Wheeling-Pittsburgh Steel</u> <u>Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)</u>, 72 B.R. 845 (Bankr. W.D. Pa. 1987). Generally, courts defer to a debtor in possession's business judgment to reject an executory contract or lease. <u>See NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 525 (1984); In <u>re Wheeling-Pittsburgh Steel Corp.</u>, 82 B.R. at 829.

68.     The Debtors believe that such streamlined procedures for the rejection of Unassumed Contracts will benefit the Debtors' estates, creditors and other parties-in-interest by minimizing the delay and expense of obtaining separate court approval for the rejection of each Unassumed Contract and allowing the Debtors to immediately cut off the accrual of administrative expenses once they have determined to reject an Unassumed Contract.

69.     The counterparties to the Unassumed Contracts to be rejected will not be prejudiced by the Rejection Procedures because, by serving notice of entry of the Sale Procedures Order on all such parties, the Debtors have provided sufficient notice of their possible intent to reject the Unassumed Contracts. Moreover, upon receipt of a Rejection Notice, a counterparty will have received specific advance notice of the Debtors' intent to reject its Unassumed Contract and the pre-approved subsequent effective date of the rejection. <u>See, e.g.,</u> <u>In re Mid Region Petroleum, Inc.</u>, 111 B.R. 968 (Bankr. N.D. Okla. 1990) (effective date of rejection of leases was the date the trustee gave notice to lessor of intent to reject); <u>In re Carlisle</u> <u>Homes, Inc.</u>, 103 B.R. 524, 535 (Bankr. D.N.J. 1988) (debtor may reject executory contract by clearly communicating intention to reject).

70.     The Debtors also request that the Court (1) establish a bar date for any claims arising in connection with the rejection of an Unassumed Contract, requiring that all such claims be filed on or before the later of (i) thirty (30) days after the Effective Date of Rejection

or (ii) the bar date established by the Bankruptcy Court for filing proofs of claim against the

Debtors, failing which the claimant will be forever barred from asserting such claim; (2) order

that if the Debtors have deposited monies with a landlord as a security deposit or otherwise, the

landlord holding such monies may not set off or otherwise use such deposit without the prior

authorization of the Bankruptcy Court; and (3) order that any personal property remaining on any

leased premises following the Effective Date of Rejection is deemed abandoned, and the landlord

may dispose of such property without liability to any party.

71.     Finally, Section 105 of the Bankruptcy Code provides in relevant part that

"[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of this title." 11 U.S.C. §105(a).  The Debtors submit that authority to

implement the Rejection Procedures is appropriate in these Chapter 11 cases and is well within

the Court's equitable powers under Section 105 of the Bankruptcy Code.  The Rejection

Procedures will minimize the delay and expense to the Debtors' estates of obtaining separate

court approval for each rejection of an Unassumed Contract and thereby benefit the Debtors'

creditors and estates.

**F.      The Break-Up Fee and the Expense**
         **Reimbursement are Reasonable and Appropriate**

72.     Approval of the Break-Up Fee and the Expense Reimbursement are

governed by standards for determining the appropriateness of bidding incentives in the

bankruptcy context established by the Third Circuit in Calpine Corp. v. O'Brien Envtl. Energy,

Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) ("O'Brien").  In O'Brien,

the Third Circuit concluded that "the determination whether break-up fees or expenses are

allowable under § 503(b) must be made in reference to general administrative expense

jurisprudence.  In other words, the allowability of break-up fees . . . depends upon the requesting

41

party's ability to show that the fees were actually necessary to preserve the value of the estate." O'Brien, 181 F.3d at 535. Here, the Break-Up Fee should be approved because it will provide a benefit to the Debtors' estates.

73.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, "[I]f the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

74.     In O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of break-up fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial

adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." See O'Brien, 181 F.3d at 536.

75.     Whether evaluated under the "business judgment rule" applied by many courts[10] or the Third Circuit's "administrative expense" standard, the Break-Up Fee and the Expense Reimbursement should be approved. First, all negotiations between the Debtors and Printronix have been conducted on a good faith, arms' length basis. Second, based on the Debtors' pre-filing solicitation process, the Debtors have determined that the Break-up Fee and the Expense Reimbursement are necessary to attract and retain a stalking horse bidder. Specifically, the initial expressions of interest received by the Debtors from Printronix indicated that Printronix would not be willing to act as a stalking horse without some form of bid protection in the event the Debtors determine to sell the Purchased Assets to another bidder. The Debtors' ability to continue to seek a higher or better offer without risk of losing a "bird-in-the-hand" would be eliminated if the Debtors could not secure a stalking horse bidder. Therefore, absent authorization of the payment of the Break-Up Fee and the Expense Reimbursement, the Debtors may lose the opportunity to obtain the highest and best available offer for the Purchased Assets.

76.     The Debtors submit that authorization of the Break-Up Fee and the Expense Reimbursement will not chill the bidding (if any) for the Purchased Assets. The Break-Up Fee and the Expense Reimbursement were heavily negotiated items and the Debtors believe that the Break-Up Fee and the Expense Reimbursement are appropriate under the circumstances because: (i) Printronix is providing a substantial benefit to the estates by acting as a "stalking horse" bidder for the Purchased Assets; (ii) the Purchased Assets have been marketed to allow all

---

[10] See Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed 3 F.3d 49 (2d Cir. 1993).

43

known and potentially interested parties an adequate opportunity to offer better terms to the

Debtors prior to the establishment of any bid protections; (iii) the APA will provide a floor by

which other bids may be judged; (iv) the Break-Up Fee and the Expense Reimbursement

afforded Printronix were material inducements for Printronix' entry into the APA; and (v) the

terms of the APA, including the bid protections, taken as a whole, amount to the highest and best

offer for the Purchased Assets in the Debtors' business judgment.

77.     The proposed Break-Up Fee is fair and reasonable given the exigencies of

the instant transaction and the current state of the credit markets.  First, paying the Break-up Fee

equal to approximately 5.4% of Printronix' purchase price plus the Expense Reimbursement on

account of Printronix' risk that the Debtors sell the Purchased Assets to another bidder is

reasonable and customary in this type of transaction.  After considering the reasonableness of

bidding incentives, courts have approved a range of break-up fees as a percentage of the

purchase price as being appropriate under the facts and circumstances of the case.  See In re Chi-

Chi's Inc., Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); In re

Great Northern Paper, Inc., Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (fee of 5.4%

plus reimbursement of expenses upheld); In re Montgomery Ward Holding Corp., Case No. 97-

1409 (PJW) (Bankr. D. Del. February 17, 1998); In re Hechinger Investment Company Inc.,

Case No. 99-2261 (PJW) (Bankr. D. Del. October 1, 1999).

78.     Second, payment of the Break-Up Fee and the Expense Reimbursement is

not likely to diminish the Debtors' estates.  The Debtors will incur the obligation to pay the

Break-Up Fee and the Expense Reimbursement only upon the consummation of the Sale, and a

Qualifying Bid, because of the overbid provisions of the Sale Procedures, must be a bid for the

Purchased Assets in their entirety for a price not less than $40,127,500 with a cash portion of at least $3.0 million (the combined amount of the Break-Up Fee and the Expense Reimbursement).

79.     Finally, the Break-Up Fee and the Expense Reimbursement were negotiated in good faith and were the product of arms' length negotiations.

80.     The Debtors have demonstrated a sound business justification for authorizing the Break-Up Fee and the Expense Reimbursement and their clear necessity and benefit to these estates.  Thus, the Debtors request that this Court approve and authorize the Break-Up Fee and the Expense Reimbursement.

**G.     Relief from the Ten-Day Waiting Periods
Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

81.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  Bankruptcy Rule 7062 further provides a stay of proceedings to enforce a judgment.  The Debtors request that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h), 6006(d) and 7062 are waived.

82.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction

45

to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

83.     Accordingly, the Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h), 6006(d) and 7062.

## NOTICE

84.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the 30 largest unsecured creditors for the Debtors on a consolidated basis as identified in the Debtors' Chapter 11 petitions; (iii) counsel to the Debtors' pre-petition lenders; (iv) all parties who are known to possess or assert a secured claim against the Purchased Assets; (v) all contract and lease counterparties; (vi) the Internal Revenue Service; (vii) the U.S. Securities and Exchange Commission; and (viii) all parties entitled to notice under Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request (A) entry of the proposed Sale Procedures Order, substantially in the form attached hereto as Exhibit A, (B) entry of the proposed Sale Order, substantially in the form attached hereto as Exhibit E, and (C) such other and further relief as the Court deems just and proper.

[SIGNATURE PAGE FOLLOWS]

8898/73475-002 Current/12887081v16

Dated: January 27, 2009
      Wilmington, Delaware

                                    MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                    _____
                                    Robert J. Dehney (Bar No. 3578)
                                    Gregory T. Donilon (Bar No. 4244)
                                    Ann C. Cordo (Bar No. 4817)
                                    John A. Sensing (Bar No. 5232)
                                    1201 N. Market Street
                                    P.O. Box 1347
                                    Wilmington, DE  19899-1347
                                    Telephone:  (302) 658-9200
                                    Facsimile:  (302) 658-3989

                                    *Proposed Counsel for the Debtors and Debtors-in-Possession*

47